**Darol D. TAYLOR, a minor by his Guardian, David A. Taylor**

**v.**

**PAUL O. ABBE, INC., Appellant in No. 74–1787,**

**v.**

**DIAMOND SHAMROCK CHEMICAL CO., SUPERIOR ZINC DIVISION, SUPERIOR ZINC COMPANY, Third-Party Defendant, Appellant in No. 74–1788.**

**Nos. 74–1787 and 74–1788.**

United States Court of Appeals, Third Circuit.

Argued Feb. 28, 1975.

Decided May 15, 1975.

Howard D. Scher, Alan R. Kutner, Goodis, Greenfield, Henry, Shaiman & Levin, Philadelphia, Pa., for appellee.

Francis E. Marshall, Marshall, Dennehey & Warner, P. A., Philadelphia, Pa., for appellant, Paul O. Abbe, Inc.

Robert R. Reeder, White & Williams, Philadelphia, Pa., for appellant, Superior Zinc Co.

Before VAN DUSEN, GIBBONS and HUNTER, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

This case involves the question of a manufacturer's liability, under section 402A of the Restatement (Second) of Torts,[1] for an alleged design defect of a continuously operating pebble mill. Appellee Taylor, a seventeen-year old boy, sustained severe injuries when his right hand got caught in the nip point of two interlocking revolving gears. As a result of this accident his hand was later amputated.

The mill was owned and operated by Taylor's employer, Superior Zinc Co. ("Superior"), and had originally been manufactured in 1909 by the Hardenge Company (not a party to this law suit). In 1964, Superior contacted appellant Paul O. Abbe, Inc. ("Abbe") to request quotations for the replacement of a worn cylinder, the large drum in which the grinding took place (187a). An Abbe representative, R. S. Page, then visited Superior's plant and took measurements. Abbe concluded, however, that because its cylinder had a different shape than the one on Superior's Hardenge mill, replacement of the cylinder would also necessitate provision of a new ring gear (which surrounds the cylinder), a new pinion gear to mesh properly with the ring gear, and a new jack shaft to connect the pinion gear to the motor (191a–192a). Abbe thus provided those four parts, and Superior continued to use the base, the motor and the "V" belts (connecting the motor to the jack shaft) from the original Hardenge mill. Abbe had nothing to do with the assemblage of the mill, since it merely shipped the parts to Superior. There was also uncontroverted evidence that Abbe offered to provide, at an additional cost of $110.00, a guard to cover the point at which the ring and pinion gears meshed, but that Superior rejected the offer of this safety device (207a–209a, 219a).

The accident occurred in 1970, while Taylor was taking a break near the mill.

---

1. Restatement Torts § 402A provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

  (a) the seller is engaged in the business of selling such a product, and

  (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

  (a) the seller exercised all possible care in the preparation and sale of his product, and

  (b) the user or consumer has not brought the product from or entered into any contractual relation with the seller.

While plaintiff's complaint also listed a cause of action in negligence, the case against Abbe was tried and submitted to the jury solely on the basis of strict liability (108a, 546a).

At the trial, plaintiff testified that he had placed his work gloves on top of a 42″ high guard rail surrounding the mill, and that when he noticed that they had fallen to the ground between the rail and the mill, he reached down to retrieve them. The next thing he knew was that he found himself "being caught, being pulled" into the unguarded inrunning nip point of the mill (126a). He did not recall exactly how his hand got caught in the gears (127a). He began screaming for help and tried without success to stop the machine by pulling on the "V" belts and by searching for an on-off switch. After more than fifteen minutes had passed another worker finally located an on-off switch forty feet away and shut off the mill.

Plaintiff then brought this suit against Abbe in the Eastern District of Pennsylvania.[2] Through his expert witness, plaintiff contended that mill manufactured by Abbe was defectively designed in two respects: it lacked both a guard over the gears and an on-off switch in the vicinity of the machine (275a). At the conclusion of the evidence, the trial judge instructed the jury that the absence of either a safety guard or an on-off switch could constitute a design defect which made the mill unreasonably dangerous (549a, 558a).

The precise question presented by this case, as we see it, is as follows: assuming *arguendo* that the absence of a gear guard and an on-off switch made the mill unreasonably dangerous, and that this "defect" in design was the proximate cause of plaintiff's injuries, was the parts supplier (Abbe) *responsible* for the design defect? Since this is a diversity case, we are required to follow the law of the forum state, Pennsylvania. However, while Pennsylvania has adopted the principle of strict liability set forth in Restatement § 402A, Webb v. Zern, 422 Pa. 424, 220 A.2d 853 (1966), and while it has indicated that design defects are actionable under § 402A, Bartkewich v. E. K. Billinger, 432 Pa. 351, 247 A.2d 603 (1968), we have found no Pennsylvania cases involving the precise issue presented here.[3] Nevertheless, we believe that the requirement that liability only be imposed where the manufacturer is responsible for the defective condition is necessarily implicit in § 402A, and the absence of case law is probably a result of the fact that, in most cases, the manufacturer's responsibility is either self-evident or is arguably negated by such traditional doctrines as superseding cause or change in condition.[4] For the reasons discussed below, we do not believe that Abbe was responsible for the alleged defects, and we find no indication that Pennsylvania courts would extend the principle of strict liability to cover these facts. Consequently, we conclude that plaintiff's judgment against Abbe must be reversed and judgment n.o.v. must be entered in favor of Abbe.

## A. THE ON–OFF SWITCH

■ The evidence in this case shows conclusively that Abbe had absolutely nothing to do with the electrical set-up of the mill (221a). Rather, it merely

**2.** The complaint alleged causes of action both in negligence and strict liability. Since plaintiff pursued only the strict liability theory at trial (108a), the trial court granted a directed verdict in favor of Abbe on the negligence allegations (322a).

**3.** Pennsylvania has imposed liability under § 402A on a supplier of component parts where one of the parts is defective. Burbage v. Boiler Engineering and Supply Co., 433 Pa. 319, 249 A.2d 563 (1969). However, this is not such a case, since plaintiff seeks to impose liability for a *design* defect, and there is no evidence or contention that any of the compo-

nent parts supplied by Abbe malfunctioned in any way.

**4.** Neither the doctrine of change in condition, which is explicitly made a defense under § 402A(1)(b) (*see* note 1 *supra*), nor the doctrine of superseding cause (*see* Schreffler v. Birdsboro Corp., 490 F.2d 1148, 1154 (3d Cir. 1974)) is applicable to this case, since they both refer only to a changing circumstance or condition arising *after* the product has left the manufacturer's hands. Both of these doctrines, however, are consistent with the general tort rule that a defendant can be held liable only where he is responsible for the harm suffered.

provided replacements for the cylinder, the jack shaft and the two gears, and Superior chose to keep the same electric motor that had been furnished as part of the original Hardenge mill. Abbe was not requested to submit a proposal on any parts relating to electrical switches or mechanisms, nor was it requested to install any such parts. Not only did Abbe in fact have nothing to do with the electrical set-up, but the replacement parts it furnished comprised a distinct unit independent of the mill's electrical system; none of the parts provided were directly connected to any electrical wiring or switches. If Abbe had furnished the motor as well as the other parts, it might arguably be considered responsible for the safety of the electrical set-up powering the motor. However, since it only supplied individual component parts which were to be assembled by the purchaser alone and which were to be powered by an existing motor manufactured by someone else, we cannot see any legal responsibility on Abbe's part for the electrical system connected to that motor. We see no logical reason for requiring a supplier of component parts to insist that the purchaser of those parts change its existing electrical set-up to place an on-off switch closer to an existing motor.

## B. THE GEAR GUARD

■ Abbe's failure to provide a gear guard presents a more difficult question, since such a guard is arguably an integral part of the functioning unit provided by Abbe, and thus the provision of a guard would appear to be more a matter of Abbe's concern than the location of an electrical switch to turn off an existing Hardenge motor. Nevertheless, we conclude that as a matter of law Abbe was not responsible for the absence of a guard. Of critical importance in this case is the undisputed testimony that Abbe offered to sell such a guard to Superior but that Superior refused it. Under these circumstances, we think it clear that the responsibility for the absence of the guard should be placed on Superior rather than Abbe, since Superior was the party which made the decision as to the composition of the fully assembled mill. We believe that in a case like this a supplier should be required only to make a bona fide offer of a safety device. Where it has made such an offer and that offer has been refused, it should not be held liable for the failure to provide the particular safety device.

We do not mean to imply that a supplier may always avoid liability where there is uncontradicted evidence that it offered a safety device which was refused. In many cases there may well be strong public policy reasons for imposing liability despite such an offer and refusal. However, we believe that no such reason is present here. Abbe was under no statutory obligation to furnish a gear guard under these circumstances, and thus we are not faced with the situation where a manufacturer seeks to avoid a legislatively-imposed responsibility. Also, while we must accept the jury's conclusion, based on expert testimony, that the mill was unreasonably dangerous, we do not believe that the absence of a gear guard was such a hazard that it was a near certainty that the machine, if operated at all without the guard, would result in serious injury.[5] Thus, the public policy considerations against absolving the offeror of a safety device from liability are less compelling than, for example, a case in which the manufacturer of a car makes brakes optional. In addition, the purchaser here was an established business entity with over fifty years of experience in the operation of its pebble mill, rather than an individual consumer who might warrant special judicial protection.

■ Another factor here is that Abbe neither supplied all the parts of the mill nor assembled the parts it did supply. Where a manufacturer sells a complete

---

**5.** This is especially true in light of the fact that the mill was surrounded by a forty-two inch high protective rail, a fact known to Abbe (219a).

and pre-assembled product minus only an optional safety device, there would appear to be a stronger basis for holding it responsible for the absence of a safety device than this case, where Abbe merely supplied components which were later assembled by the purchaser without any supervision on Abbe's part. Furthermore, Abbe was not supplying component parts for an entirely new mill, but was *replacing* parts on a pre-existing mill which the purchaser had been operating for over fifty years. Where a purchaser seeks only replacement parts for a pre-existing machine, it seems more logical to place responsibility for the absence of a safety device on the party requesting the replacements than on the party providing them, at least where the latter has specifically offered such a device and the purchaser has refused it.

Therefore, since Abbe merely provided individual and unassembled replacement parts for less than the entire mill, and since none of the strong public policy considerations enumerated above is present, we believe that there is no compelling reason to hold Abbe responsible for the absence of a guard which, according to the undisputed testimony, it offered to the purchaser at minimal cost. Furthermore, we do not see how a jury question is presented here. There is no dispute in this case with respect to the critical facts, and thus the only issue before us is the legal significance of those facts. See Schreffler v. Birdsboro Corp., 490 F.2d 1148, 1154 (3d Cir. 1974). Consequently, since we believe that Abbe was not legally responsible either for the absence of the gear guard or a nearby on-off switch, the only two bases on which strict liability was premised, we conclude that Abbe was entitled to judgment n.o.v.

The judgment of the district court will be reversed with instructions to grant judgment n.o.v. in favor of Abbe.[6]

---

6. Abbe impleaded Superior as a third-party defendant, and the jury entered judgment in favor of Abbe against Superior. Since Superior's liability was wholly derivative of Abbe's, and since we conclude that judgment n. o. v. must be entered against plaintiff, the judgment against Superior in No. 74–1788 must automatically be vacated. Thus, there is no need to consider any of the issues raised by Superior in its appeal.